UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HECTOR HERNANDEZ,<br><br>Defendant. | Case No. __23mj1663__<br><br>COMPLAINT FOR VIOLATION OF:<br><br>21 U.S.C. § 841(a)(1) and 846 –<br>Attempted Distribution of Controlled Substances (Felony); 18 U.S.C. § 201 – Receiving Bribe by Public Official |

The undersigned complainant being duly sworn states:

Count 1

(Attempted Distribution of Controlled Substances)

On or about May 10, 2023, within the Southern District of California, defendant HECTOR HERNANDEZ did knowingly and intentionally attempt to distribute 50 grams and more of methamphetamine (actual), a Schedule II Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(A), and 846.

Counts 2-3

(Receiving Bribe by Public Official)

On or about the dates below, within the Southern District of California, defendant HECTOR HERNANDEZ, a public official, that is, a United State Border Patrol Agent, did directly and indirectly corruptly demand, seek, receive, accept, and agree to receive and accept something of value personally in return for being induced to do and omit to do an act in violation of defendant's official duties, as set forth below:

| Count | Date | Bribe |
|---|---|---|
| 2 | 5/8/2023 | $5,000 USD for using defendant's Border Patrol position to open a restricted border fence/gate as part of his agreement to allow an unknown undocumented non-citizen to enter the United States from Mexico. |
| 3 | 5/9/2023 | $20,000 USD for using defendant's Border Patrol vehicle to retrieve controlled substances near the United States/Mexico border and later deliver those controlled substances to a purported drug trafficker. |

All in violation of Title 18, United States Code, Section 201(b)(2)(C).

And the complainant states that this complaint is based on the attached Probable Cause Statement, which is incorporated herein by reference.

Prescilla Gonzales
Special Agent
Office of Inspector General
Department of Homeland Security

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 10th day of May 2023.

HON. BERNARD G. SKOMAL
UNITED STATES MAGISTRATE JUDGE

2

# PROBABLE CAUSE STATEMENT

I, Special Agent Prescilla Gonzales, of the Department of Homeland Security (DHS), Office of Inspector General (OIG), declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a Special Agent with the DHS OIG and have been so employed since December 2020. During my time with DHS OIG, I have investigated crimes involving public corruption, bribery, fraud, narcotics trafficking, human trafficking, excessive use of force, and violations of civil liberties. Prior to DHS OIG, I was a Special Agent with the United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) course.

2. As a federal law enforcement officer for approximately 16 years, I have received formal training, as well as extensive on-the-job training, relative to the investigation of federal crimes involving human smuggling, kidnaping/extortion, firearms smuggling, and narcotics smuggling. I have participated in investigations which involved the use of electronic surveillance techniques. I have monitored or overheard numerous calls or meetings between informants or undercover agents, firearms traffickers, drug traffickers and money launderers. I have investigated firearms trafficking, illicit narcotics, controlled substances, money laundering, wire fraud and other crimes that have resulted in arrests, indictments, and convictions.

3. During the course of my duties, I have learned the following information from my personal participation in this investigation and by reading reports prepared by other law enforcement officers. The following does not contain all the information known to me or other federal agents and state and local officers regarding this

investigation into the methamphetamine distribution and human smuggling related activities of US Border Patrol Agent Hector HERNANDEZ (BPA HERNANDEZ) but does contain those facts believed to be necessary to establish the requisite probable cause.

4. In April 2023, based on evidence that BPA HERNANDEZ was engaged in border corruption activities in violation of his duties as a United States Border Patrol Agent, a DHS OIG Undercover Agent (UCA) was introduced to BPA HERNANDEZ.

5. On May 8, 2023, BPA HERNANDEZ spoke with the UCA in a recorded phone call. BPA HERNANDEZ agreed to open a restricted government fence/gate at a coordinated time for the purposes of allowing an undocumented non-citizen (UNC) to enter the United States illegally from Mexico for financial gain. Later that evening, BPA HERNANDEZ spoke with the UCA over recorded telephone calls/text messages to discuss the opening of the restricted government fence. During one such recorded call, BPA HERNANDEZ requested that the UCA "send three" instead of "one." Based on my training and experience, as well as the content and context of the call, I believe that BPA HERNANDEZ told the UCA to send three UNCs instead of one to increase BPA HERNANDEZ's payout, based on a set fee per UNC.

6. Later on the evening of May 8, 2023, BPA HERNANDEZ, using a U.S. Border Patrol vehicle, drove to an agreed-upon location near the restricted fence/gate. BPA HERNANDEZ used an electronic device that he possessed in his capacity as a U.S. Border Patrol agent to open the gate. BPA HERNANDEZ was told by the UCA that he was doing this to allow a UNC to enter the United States via the open gate in return for a payment of $5,000 USD to BPA HERNANDEZ, but in fact, no UNC entered the United States.

7. After BPA HERNANDEZ did, in fact, open the fence, BPA HERNANDEZ and the UCA spoke in a recorded phone call. During that call, the UCA told BPA HERNANDEZ that, when they met the next day, they would talk about another "project" through which BPA HERNANDEZ could make more money.

8. On May 9, 2023, BPA HERNANDEZ met with the UCA in a parking lot in the Otay Lakes area of San Diego to receive a $5,000.00 payment for his role in furthering the smuggling of the supposed UNC. During the meeting, BPA HERNANDEZ met with the UCA, received the $5,000 payment, and counted it in the UCA's presence to confirm that it was all there. During that conversation, the UCA told BPA HERNANDEZ that there might be other "work" that BPA HERNANDEZ could do if he wanted to make more money. The UCA told BPA HERNANDEZ, in sum and substance, that the UCA was working with people in Mexico who wanted to import controlled substances and they wanted to use someone older and more experienced that they could trust. During the conversation, BPA HERNANDEZ indicated that he was not sure about going inside the border gate (i.e., between the primary and secondary border fences) to pick up bags of controlled substances because, in sum and substance, that was how someone else got caught in the past. I believe that BPA HERNANDEZ was referring to *United States v. Noe Lopez*, 3:17CR0086-DMS, a case in which BPA Noe Lopez was arrested, convicted, and sentenced for attempting to smuggle methamphetamine and cocaine into the United States. In response, the UCA told BPA HERNANDEZ that the drugs would already be crossed into the United States and hidden somewhere near the border fence for him to pick up. BPA HERNANDEZ said that he was, in fact, willing to do that and would call the UCA later in the evening when BPA HERNANDEZ started his shift and learned what his work assignment was for that night.

9. During the evening of May 9, 2023, BPA HERNANDEZ contacted the UCA and informed him that BPA HERNANDEZ was available to "work" and would contact the UCA at approximately 10:00 p.m. that evening. When BPA HERNANDEZ contacted the UCA, the UCA informed BPA HERNANDEZ that there was a duffel bag loaded with drugs ready for BPA HERNANDEZ to retrieve in a storm drain near the border fence. At approximately 10:37 p.m., BPA HERNANDEZ drove to the location of the duffel bag in his Border Patrol service vehicle and retrieved the duffel bag. Prior to storing the duffel bag in the storm drain, law enforcement placed approximately 10 kilograms of sham methamphetamine, one pound of methamphetamine (actual), and a tracking device into the bag. After BPA HERNANDEZ retrieved the bag, he continued to operate his Border Patrol service vehicle. During that time, the tracking device indicated that the bag was taken to the area of BPA HERNANDEZ's residence. After going back to his residence, BPA HERNANDEZ returned to work in the field, while data from the tracking device indicated it remained at or near his residence.

10. Agents conducted surveillance at BPA HERNANDEZ's residence to monitor the location of the duffel bag. At approximately 7:10 a.m. on May 10, 2023, following the end of his Border Patrol shift, BPA HERNANDEZ returned to his residence driving his personal vehicle and entered his house. At approximately 7:16 a.m., BPA HERNANDEZ was observed exiting the residence carrying a black bag that was similar in size to the duffle bag. BPA HERNANDEZ then drove from the residence to a meeting location in Chula Vista, California. BPA HERNANDEZ and the UCA agreed this was the location where the duffel bag full of drugs would be turned over to the UCA and where BPA HERNANDEZ would receive payment in the amount of $20,000 USD for his transportation and storage of the methamphetamine.

11. At approximately 7:30 a.m., BPA HERNANDEZ arrived at the meeting location carrying the black bag. Upon arriving and meeting with the UCA, BPA HERNANDEZ commented that the bag was heavy. When BPA HERNANDEZ walked to the UCA's vehicle, he showed the UCA that, within the bag he was carrying was the black duffel bag containing the controlled substances. Also in BPA HERNANDEZ's bag was what appeared to be BPA HERNANDEZ's wallet and ID. BPA HERNANDEZ then placed the bag containing the duffel bag full of drugs into the UCA's trunk. The UCA said he was going to retrieve BPA HERNANDEZ's payment from inside the UCA's vehicle. At that time, BPA HERNANDEZ was placed under arrest.

12. Agents later opened the duffel bag and confirmed that the approximately 10 kilograms of sham methamphetamine and one pound of methamphetamine (actual) remained inside the bag that BPA HERNANDEZ had retrieved from the storm drain and delivered to the UCA.